CPT CORPORATION and PacifiCorp
Capital, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1005C.

United States Claims Court.

March 13, 1992.

Michael E. Geltner, Washington, D.C., for plaintiffs.

Robert E. Kirschman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motions for summary judgment and to dismiss part of the complaint for lack of subject matter jurisdiction. For the reasons set forth below, the court *sua sponte* dismisses the complaint, without prejudice, for lack of jurisdiction over the subject matter.

### FACTS

In 1983, the General Services Administration (GSA) entered into schedule contracts with CPT Corporation which allowed various government agencies to rent Automatic Data Processing Equipment (ADPE) from CPT. Included in the schedule contracts were provisions for equipment purchases under a federal lease to ownership plan (FLTOP), through which the government could acquire title to the equipment after making the necessary monthly lease payments. All payments, if properly invoiced, were due on the thirtieth day of the month and the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901–3907 (1988), applied to all contracts.

Pursuant to the GSA schedule contracts, the Army entered into a series of ADPE leases with CPT. The leases covered the time from September 30, 1985 to September 1987, except for the months of October 1986, January 1987, and February 1987. On September 29, 1987, defendant issued a modification to the lease covering November and December 1986 to exercise its purchase option under that lease. After the purchase orders were issued, CPT assigned its interests in the equipment and the leases to PacifiCorp, a financing institution. PacifiCorp, however, did not perfect its assignment, *see, e.g.,* 41 U.S.C. § 15 (1988), but, as the real party in interest, is a party-plaintiff in accordance with RUSCC 17.

On June 13, 1989, plaintiffs sent a letter to the Army Contracting Officer in Stuttgart, asserting that payment for the buyout had been received late, that certain lease payments had either been paid late or not at all, and requesting payment of the unpaid amounts and interest pursuant to the Contracts Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1988), and the PPA. The letter requested $43,669.81 and asked for a written decision within sixty days.

The contracting officer responded by noting that the buyout had not been properly invoiced by plaintiffs, and requested that plaintiffs submit a proper invoice and additional documentation to confirm the late or missing payments. In a letter on August 30, 1989, plaintiffs' attorney admitted that the buyout modification had not been properly invoiced and that "arrears rentals for months prior to the buyout date were received late and mistakenly applied as partial payment of the buyout." The letter stated that "the proper resolution of the matter [would be] to have the claim withdrawn and the buyout invoiced." An invoice was enclosed with the letter, and a separate copy of the invoice was sent to the Army payment office. Plaintiffs advised that if payment were received under the new invoice, their "claims" would be withdrawn.

By December 7, 1989, plaintiffs had not received payment and another letter to the contracting officer was dispatched, this time seeking $49,021.39 plus PPA interest.[1] Although the letter was characterized as "a claim in accordance with the [CDA]" and requested a written decision within sixty days, it also said to contact plaintiffs' attorney if settlement was desired. The Contracting Office, through its Regional Counsel, responded in a letter dated January 4, 1990 which indicated that $11,389.64 of the buyout had been paid "for almost two years" and that only $37,631.75 was owed. Accordingly, defendant agreed to send a check for the balance "before the week [was] out," but since plaintiffs' invoice was incorrect, no interest would be given. The letter stated that it "was not a final decision of a contracting officer under the [CDA]."

In a letter dated February 9, 1990, plaintiffs' attorney acknowledged receipt of defendant's check for $37,631.15, but then asked for an additional $33,276.46, plus interest, for missing ADPE rental payments for June, July, and September 1986, January and February 1987, part of May 1987, and July, August, and September 1987. As in previous letters, plaintiffs asked for "a written decision within 60 days, as required by CDA." In reply, defendant wrote that it had researched the matter and agreed that the rental payments for June, July, and September 1986, and May 1987 were covered by contract and were owed. However, no contract had existed for October 1986 and January, February, July, August, and September 1987. Plaintiffs were informed that their ratification of January and February 1987 had been improperly completed, and that the proper paperwork would need to be resubmitted. The rental of equipment for October 1986 would also have to be ratified and defendant suggested that since it had already been paid, plaintiff should apply that payment to September 1986. The letter stated that no action by plaintiffs would be necessary to start the ratification of July, August, and September 1987, and that the payments for June and July 1986, and May 1987, would be processed promptly.

Plaintiffs, in a letter on May 21, 1990, agreed to apply the October 1986 payment to September 1986, and to resubmit the ratification for January and February 1987. At the suggestion of the contracting office, they also reserved their claims for October 1986, and for July, August, and September 1987, and renewed their demand for CDA and PPA interest. In response, defendant wrote that plaintiffs' requests for interest were inappropriate since the government had just received proper invoices for the missing payments covered by contract. Defendant's letter also pointed out that plaintiffs had improperly completed the original ratification of January and February 1987, and that, upon further research, the rentals for July, August, and September 1987 had apparently already been paid

---

1. As originally agreed upon, the price of the buyout was $49,021.39. However, after defendant exercised its buyout option, the buyout price rose to $49,674.04. Although an authorized representative of CPT assured defendant that the buyout was complete under the original price, CPT rejected the government's order because of the price discrepancy. Later, the original price was confirmed but a proper invoice was never sent to defendant.

to an affiliate of CPT.[2] In light of these facts, defendant suggested that plaintiffs "seriously consider dropping [the interest] claims, in a spirit of compromise." The letter closed by stating that it was not a "final decision of a Contracting Officer under the CDA."

On July 23, 1990, plaintiffs' attorney wrote that he "would be willing ... to press [his] client to waive any interest claim" if prompt payment was received. Approximately a month later, plaintiffs' attorney wrote that the process was "dragging" and that his clients "should have interest." Defendant wrote back and outlined the progress made and again stated that plaintiffs were not entitled to interest. Plaintiffs' attorney, on September 27, 1990, again wrote that if payment was received within thirty days, plaintiffs would "not seek further interest on these funds." Subsequent letters established that all missing payments, except October 1986, were received. On February 21, 1991, plaintiffs' attorney inquired as to when that final payment would be received, but made no demand for interest. At no time did the contracting officer issue a final decision on any of plaintiffs' submissions.

On March 11, 1991, plaintiffs filed an action in this court seeking payment of the ADPE rental for October 1986 and, pursuant to the CDA and the PPA, interest on the buyout and all late rental payments. After this complaint was filed, plaintiffs received payment for October 1986.

### DISCUSSION

■ Defendant moved to dismiss plaintiffs' claims under the PPA for lack of subject matter jurisdiction, and for summary judgment on plaintiffs' claims under the CDA. Although defendant did not challenge jurisdiction over the CDA claims, this court has an obligation to address its subject matter jurisdiction, even if it must do so *sua sponte*.[3] RUSCC 12(h)(3); *Johns–Manville Corp. v. United States*, 893 F.2d 324, 328 (Fed.Cir.1989); *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed.Cir.1988); *Nussinow v. United States*, 23 Cl.Ct. 556, 559 (1991); *Wirt v. United States*, 21 Cl.Ct. 92, 93 (1990). In considering whether to dismiss a complaint for lack of subject matter jurisdiction pursuant to RUSCC 12(b)(1), the court must accept as true any undisputed allegations of fact made by plaintiffs. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988); *see Scheuer v. United States*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). When disputed facts relevant to the issue of jurisdiction exist, the court is required to decide those facts. *Reynolds*, 846 F.2d at 747; *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988). Plaintiffs have the burden of establishing jurisdiction. *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986).

■ This court's jurisdiction is defined by the Tucker Act, 28 U.S.C. § 1491 (1988). The Tucker Act alone does not create a substantive right to recover money, but instead waives sovereign immunity under specific conditions. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). For this court to exercise jurisdiction over plaintiffs'

---

**2.** Subsequent letters established that CPT's West German affiliate, CPT Text Computer, had in fact received payment for July, August, and September 1987, and that CPT eventually obtained these funds.

**3.** In making its motion for summary judgment, defendant relied on *Borough of Alpine v. United States*, 923 F.2d 170 (Fed.Cir.1991), *aff'g* 19 Cl. Ct. 802 (1990), which held that, in cases of untimely appeals from the final decision of a contracting officer under the CDA, *see* 41 U.S.C. § 609(a)(3) (1988), the United States Claims Court continues to have subject matter jurisdiction over the appeal, but is not entitled to exercise its subject matter jurisdiction. 923 F.2d at

171 n. 1. *Borough of Alpine* is inapplicable to the present case. Compliance with the procedures for bringing a claim under the CDA is a prerequisite to this court's exercise of subject matter jurisdiction. *White Plains Iron Works, Inc. v. United States*, 229 Ct.Cl. 626, 629–30 (1981); *Overall Roofing & Constr., Inc. v. United States*, 20 Cl.Ct. 181, 183 (1990), *aff'd*, 929 F.2d 687 (Fed.Cir.1991). See also 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1550, at 195 & n. 4 (1990), which states that failure to exhaust administrative remedies is cause for dismissal under Fed. R.Civ.P. 12(b)(1).

claims, the claims must be predicated on a constitutional provision, statute, executive department regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (1988). Since plaintiffs have alleged claims under the CDA and the PPA, the only question for the court to decide is whether plaintiffs have complied with the jurisdictional prerequisites of those acts.

## I. Plaintiffs' Claims Under the CDA.

The CDA states that all "claims by a contractor shall be in writing and shall be submitted to the contracting officer for a [final] decision." 41 U.S.C. § 605(a) (1988); *Dawco Constr., Inc. v. United States*, 930 F.2d 872 (Fed.Cir.1991). The requirements of the CDA are mandatory jurisdictional prerequisites. *White Plains Iron Works, Inc. v. United States*, 229 Ct.Cl. 626, 629–30 (1981); *Overall Roofing & Constr., Inc. v. United States*, 20 Cl.Ct. 181, 183 (1990), *aff'd*, 929 F.2d 687 (Fed.Cir. 1991). The fact that a contractor "referred to a submission as a claim, or treated it as such," does not mean that the contractor's designation will have controlling legal significance. *Essex Electro Eng'rs, Inc. v. United States*, 22 Cl.Ct. 757, 759–60 (1991). For a claim to be legitimate, it must be in dispute. *Dawco*, 930 F.2d at 878; *Essex*, 22 Cl.Ct. at 765; *Esprit Corp. v. United States*, 6 Cl.Ct. 546 (1984), *aff'd mem.*, 776 F.2d 1062 (Fed.Cir.1985). "A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim." 48 C.F.R. § 33.201 (1990). Furthermore, such requests for payment do not "metamorphose into claims by the reagent of dispute. A separate document constituting a claim must be submitted for resolution." *Essex*, 22 Cl.Ct. at 764–65.

The court finds, contrary to the arguments of plaintiffs, that their several letters did not constitute a claim under the CDA. At no time did the government attempt to challenge its liability for the ADPE rentals or the buyout. Nor were the amounts of the rentals and the buyout ever questioned except to ensure that an overpayment was not made. If a claim as to the buyout existed initially, plaintiffs withdrew it in their attorney's August 30, 1989 letter. Although plaintiffs' letters invoked the CDA and demanded a decision from the contracting officer, this language did not determine the legal status of the letters. *Essex*, 22 Cl.Ct. at 759–60. If parties are in a pre-dispute, negotiation posture, a contractor's submissions will not be considered claims even though the CDA was invoked and the submissions were characterized as claims. *See Mayfair Constr. Co. v. United States*, 841 F.2d 1576, 1577 (Fed.Cir.), *cert. denied*, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). Here, the correspondence between the parties did not rise even to the level of a "pre-dispute, negotiation posture." The exchange of letters served only to clarify defendant's payment history, and to verify remaining liabilities. Plaintiffs' repeated invocations of the CDA and requests for written decisions were apparently tools to goad the government into action, rather than *bona fide* claims. Communications never ceased in favor of a final decision by the contracting officer. *See Dawco*, 930 F.2d at 879. Plaintiffs' letters are more properly characterized as requests for payment, rather than as claims under the CDA.

Plaintiffs also argued that their letters constituted claims for interest under the CDA. However, the law is clear that a request for CDA interest cannot exist without an underlying claim under the CDA. *Mayfair*, 841 F.2d at 1578; *Nab–Lord Assocs. v. United States*, 682 F.2d 940, 943–44, 230 Ct.Cl. 694 (1982). "Interest is ... an adjunct to an underlying claim with respect to the principal liability. By the terms of the [CDA] no interest arises absent some other claim." *Essex*, 22 Cl.Ct. at 766. Since plaintiffs did not submit a proper claim under the CDA, they are not entitled to interest under its provisions.

## II. Plaintiffs' Claims For Interest Under the PPA.

Unlike the CDA, liability for interest under the PPA does not depend on the existence of a dispute. The PPA was

enacted to "provide incentives for the Federal Government to pay its bills on time." H.R.Rep. No. 461, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.C.C.A.N. 111. Upon submission of a proper invoice, the government must pay the bill timely or incur liability for PPA interest. 31 U.S.C. §§ 3902–3903 (1988). If the invoice is disputed, no PPA interest will be paid and "interest for the period during which the dispute is being resolved, is subject to the [CDA]." 31 U.S.C. § 3907(c) (1988). In this case, since no dispute existed between the parties, interest under the PPA may be appropriate. But first, the court must examine its jurisdiction over plaintiffs' claim.

In *New York Guardian Mortgagee Corp. v. United States,* 916 F.2d 1558 (Fed. Cir.1990), the United States Court of Appeals for the Federal Circuit declined to answer the question whether compliance with the CDA was a "jurisdictional prerequisite to a suit in the [United States] Claims Court to recover interest under the Prompt Payment Act." *Id.* at 1561 n. 2. See also *National Ass'n of Rehabilitation Facilities, Inc. v. Bowen,* 840 F.2d 931, 934 (D.C.Cir.1988), where the court declined to decide whether interest penalties under the PPA would be subject to the process established by the CDA. This issue is now squarely before the court and must be resolved. For the following reasons, the court holds that claims for interest under the PPA are subject to the procedural framework of the CDA.

The legislative history of the CDA indicates that its purpose and design was to provide a comprehensive system for adjudicating contract claims against the government. S.Rep. No. 1118, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.C.C.A.N. 5235, 5250. That system applies to "[a]ll claims by a contractor ... *relating* to a [government] contract." 41 U.S.C. § 605(a) (1988) (emphasis added). Certainly, this language includes claims for PPA interest since such claims arise from, and are related to, government contracts. The PPA itself states that a "claim for an interest penalty not paid under this chapter may be filed under section 6 of the Contract Disputes Act." 31 U.S.C. § 3907(a) (1988)

(citation omitted). Furthermore, the court is unaware of any claim for PPA interest that has been decided in the Claims Court independent of the jurisdictional framework of the CDA. See generally *Ocean Technology, Inc. v. United States,* 19 Cl. Ct. 288, 289 (1990), where a PPA claim was filed pursuant to the CDA. In light of these factors, the court holds that compliance with the CDA is a jurisdictional prerequisite to adjudicating a claim under the PPA. Accordingly, the court is without jurisdiction to hear plaintiffs' claim for PPA interest.

■ Although no element of dispute is required for plaintiffs to present a claim for PPA interest, such a claim must be in writing and be submitted to the contracting officer for a final decision. 41 U.S.C. § 605(a) (1988). Here, the letters of plaintiffs' attorney demonstrated that the parties were merely in a negotiating posture as to interest. *See Mayfair,* 841 F.2d at 1576. Several times plaintiffs offered to forego interest claims if "prompt payment were made," indicating a willingness to continue negotiating and showing that no CDA claim had actually been submitted. Plaintiffs' letters simply do not constitute a claim for PPA interest under the CDA. Plaintiffs may yet be able to submit a proper claim for PPA interest, but so far they have failed to exhaust their administrative remedies.

## CONCLUSION

The letters written by plaintiffs' attorney did not amount to claims under the CDA. No dispute existed as to the payments requested and the letters indicated only the clarification of acknowledged debts. Interest under the CDA is unwarranted since proper claims under that provision were never made. Furthermore, the CDA is a jurisdictional prerequisite to bringing a PPA interest claim before the Claims Court. Plaintiffs did not submit a proper claim for PPA interest under the CDA, and, under the circumstances, this court lacks jurisdiction to hear their claim.

Following a careful examination of defendant's motion, the court grants defendant's motion to dismiss plaintiffs' claims under the PPA, and *sua sponte* dismisses plaintiffs' claims under the CDA. The Clerk of the court is directed to dismiss the complaint without prejudice. No costs.

IT IS SO ORDERED.

